PRITCHETT v. STATE.

## Opinion delivered October 1, 1923.

1.  ARSON—DESCRIPTION OF BRIDGE BURNED.—Between an indictment for arson committed by burning a railroad bridge, the property of a certain railroad company, "designated as bridge No. 7807 and situated approximately three·miles northeast of" a certain city, and proof that the bridge was situated 3½ or 3¾ miles east of said city, and that it was designated by the railroad as bridge No. 78.7 variance *held* not fatal; the statement of the bridge number being unnecessary and the mistake therein being ·merely a clerical error.

2.  CRIMINAL LAW—JUDICIAL NOTICE.—The general direction of the route of trunk line railroads is a matter of general knowledge.

3.  ARSON—VARIANCE.—In a prosecution for arson, a question of variance between the proof and the indictment is for the court, and not the jury.

4.  CRIMINAL LAW—HARMLESS ERROR.—Where there was no variance between indictment and proof, the error of submitting the question as to variance to the jury was harmless, though the court should have declared that there was no variance.

5.  ARSON—EVIDENCE.—In a prosecution for arson, in which it was claimed that defendant and another set fire to a railroad bridge, evidence *held* to sustain a conviction.

6.  CRIMINAL LAW—EVIDENCE—OTHER SIMILAR ACTS.—In a prosecution for arson, in which it was claimed that defendant and another striking employee had set fire to a railroad bridge, evidence as to depredations committed on the railroad property by other strikers *held* incompetent, in the absence of proof that there was a conspiracy on the part of the strikers to commit the unlawful acts and that the defendant was a party thereto.

7.  CONSPIRACY—CIRCUMSTANTIAL EVIDENCE.—Conspiracy to commit unlawful acts may be shown by circumstantial evidence as well as by direct testimony.

8.  CRIMINAL LAW—PREJUDICIAL ERROR.—In a prosecution of a striking railroad employee for setting fire to a railroad bridge, evidence as to other depredations committed on the railroad property, without proof of a conspiracy to commit such acts and that defendant was party thereto, was not admissible to show that the burning of the bridge in question was of incendiary origin, and was prejudicial.

9.  CRIMINAL LAW—IMPROPER STATEMENTS OF PROSECUTING ATTORNEY. —In a prosecution of a striking railroad employee for setting fire to a railroad bridge, in which defendant testified that,

during the night when the crime was alleged to have been committed, he had left for another town, where he had applied to the yardmaster for employment, the court's failure to sustain objections to the prosecuting attorney's statements that he (the prosecuting attorney) had been a railroad man, and knew that the yardmaster could not have given defendant a job, and that two persons were present during the trial who could have testified that defendant did not go to the town where he claimed to have applied for work, *held* error.

10. CRIMINAL LAW—INDICTMENT OF AIDER AND ABETTER.—Under Crawford & Moses' Dig., § 2311, providing that persons present aiding and abetting in the commission of a crime shall be indicted and punished as principal offenders, a person who was present, aiding and abetting in the commission of a crime, may be prosecuted as a principal without being indicted with the one who committed the act.

11. CRIMINAL LAW—INSTRUCTIONS ALREADY GIVEN.—Refusal to give instructions fully covered by other instructions given by the court was not error.

Appeal from Madison Circuit Court; *W. A. Dickson,* Judge; reversed.

*Duty & Duty* and *Sullins & Ivie,* for appellant.

*J. S. Utley,* Attorney General, and *John L. Carter,* Assistant, for appellee.

McCULLOCH, C. J. Appellant was convicted under an indictment charging the crime of arson, alleged to have been committed by burning a bridge of the Missouri & North Arkansas Railroad Company, a domestic railroad corporation. The part of the indictment describing the burned property is in the following language: "A certain railroad bridge, the property of a carrier, viz., the Missouri & North Arkansas Railway Company, a corporation, and of the value of $6,000, and being known and designated as bridge number 7807, and situated approximately three miles northeast of the city of Eureka Springs, in said Western District of said Carroll County."

It is contended, in the first place, that there is a fatal variance between the proof in the case and the allegations in the indictment with respect to the identity of the burned bridge. The evidence is undisputed that

the burned bridge was about three and a half or three and three quarter miles east of Eureka Springs. There is another bridge, not burned, about two and a half miles east of Eureka Springs. According to the proof, the burned bridge was designated by the railway company by the following figures: "78.7," which indicates the distance of the structure from Joplin, the northern terminus of the railroad.

Counsel for appellant invoke the application of the rule that "where a person or thing necessary to be mentioned in an indictment is described with circumstances of particular certainty, although it is not requisite, yet those circumstances must be proved." *State* v. *Anderson,* 30 Ark. 131; *Blackwell* v. *State,* 36 Ark. 178; *Bennett* v. *State,* 62 Ark. 516; *Keoun* v. *State,* 64 Ark. 231; *Lee* v. *State,* 114 Ark. 310. We do not think that the facts of this case come within the rule announced above, for there is a sufficiently distinct description of the bridge in the statement that it is a bridge owned by the railroad company approximately three miles northeast of Eureka Springs. Courts and juries, as well as individuals accused of crime, take notice of the general direction of the route of trunk line railroads. The statement of the number of the bridge was an unnecessary addition, and there was merely a clerical error in arranging the figures so as to clearly indicate the number. If a period had been placed between the figures "8" and "0," it would have indicated the number of the bridge to be 78.07, but the omission of the period and the placing of the figure "0" there changed the figures from seven-tenths to seven one-hundredths. The variance was not of sufficient substance in its nature to prove fatal.

It is also contended that the court erred in permitting the State, in order to obviate the apparent variance in the proof, to show that appellant was advised and knew of the particular bridge that was burned, and also erred in submitting the question of variance to the jury. It was unnecessary to introduce such proof, and improper

to submit the question to the jury, for the question of variance between the charge in an indictment and the proof is one for the decision of the court and not for the jury. However, there was no prejudice in either of the respects mentioned, for the reason that the court should have declared, as a matter of law and undisputed fact, that there was no variance.

There are numerous assignments of error with respect to rulings of the court in admitting and excluding testimony and in giving and refusing instructions. Only those which are deemed of importance will be discussed in this opinion.

The general direction of the railroad in question, from Harrison, Arkansas, to Seligman, Missouri, is northwesterly, but the city of Eureka Springs is on a spur running south from the main line of the road about a mile, and the bridge in question is shown by the testimony to be nearly due east from Eureka Springs. The bridge was destroyed by fire some time during the night of January 9, 1923, after eight o'clock, about which time the last train passed over the bridge, and seven o'clock the next morning, when the next train came along.

Appellant resides in Harrison, is a railroad brakeman by occupation, and is a member of an organized union known as the Brotherhood of Railroad Trainmen.

There was a strike of practically all of the employees of the railroad, which began in February, 1921, and lasted up to the incident under investigation in this prosecution. Practically all of the employees of the railroad quit work and remained out, appellant being of the number. During the period of the strike, appellant and others were drawing an allowance from the strike fund of the union. The strike was caused by a reduction in wages, which employees refused to accept.

According to the undisputed evidence, appellant and one McCurdy left Harrison in a Ford car on January 8, 1923, and reached Eureka Springs in the evening, or early in the night, stopping at a garage on the hill in

the suburbs of Eureka Springs to get repairs made on the car. After the repairs were made and the two men got supper at a nearby restaurant, they drove off, going in the direction of Seligman. The two men returned in a car about the same hour early in the night of January 9. The time is fixed by most of the witnesses at about the hour of seven in the evening. The men stopped at the garage again for repairs, and remained there until about nine o'clock; they also went to a nearby restaurant and got something to eat. There was a can in the back end of the car, which was observed by the witnesses, and the can appeared to have been one in which oil had been carried. There is a conflict in the testimony as to the size of the can—the witnesses for the State say that it was a five-gallon can, whereas appellant says that it was a two-gallon can—but it is undisputed that it was a can which had been used for handling oil. None of the witnesses testified about the contents of the can at that time, or whether it contained anything at all.

The two men got into the car, after the completion of the repairs, and rode in the direction of Harrison, and the last seen of them by those witnesses they were going in that direction. One of the State's witnesses testified that there was a third man in the car, named Kimberlin, another railroad employee on strike, who was sitting on appellant's lap in the car. There is a conflict at this point in the testimony, and appellant testified that neither Kimberlin nor any other person except himself and McCurdy was in the car. Appellant also testified that, shortly after they left Eureka Springs, they met a man by the name of Nelson, about whom there was a rumor that he was engaged in committing depredations on railroad property, and, fearing that he might arouse suspicion by going out in the car with Nelson, he got out and walked back to Eureka Springs, and obtained passage that night back to Seligman in another car. He testified that that was the last he saw or heard of McCurdy.

Neither Kimberlin nor McCurdy were introduced as witnesses, nor their whereabouts accounted for in the testimony.

The State introduced a witness named Weston, who testified that he was a farmer living near the Carroll County line, on the main highway between Seligman and Eureka Springs, and that, about five o'clock in the evening preceding the night on which the bridge was burned, two men came by in an automobile, going in the direction of Eureka Springs, and stopped at his house and inquired where they could get some whiskey. The witness identified one of the men as appellant, and testified that, after he had stated to the men that he "wasn't fooling with whiskey," appellant replied, "You need not be afraid of us; I am into it deeper than you can be. We are going to put down one of the biggest bridges on the M. & N. A. tonight." The witness further testified that appellant had a revolver in his coat pocket, with several inches of the barrel sticking out, and that he added, "We have got the stuff to do it with." The witness stated that appellant told him his name was Pritchett and that the name of the other man was McCurdy.

The next day after the burning of the bridge several persons in authority went there to make an examination, among them Mr. Murray, the railroad superintendent, and Mr. McShane, the sheriff of the county. Both of these witnesses testified that they went there about three or four o'clock in the afternoon. They stated that about half a mile from the bridge they found tracks of a Ford car where it had turned around and stopped on the side of the road; that some oil had leaked out on the ground, and that there were footprints leading from the car down towards the bridge. The tracks indicated that there were two persons, who walked on each side of the path down to the bridge, and returned single-file. One track was larger than the other, and the shoe tracks indicate that the shoes had new rubber heels, and the witness described the shoes as "a pair of English walking shoes with new rubber heels, about number eight in size." The

witness, who testified principally on the question of the identity of the shoes, stated that he lost his measurement of the tracks, but that, after appellant was arrested, he examined the shoes he had on, and that they appeared to be the size and kind that made the tracks. These witnesses found a five-gallon oil can about one hundred yards from the bridge; they stated that it was a can used for motor oil. They also testified that the soil around the bridge was slightly damp. They also testified that the ground around the bridge was rocky, rough and hilly, and that the creek which the bridge spanned was dry; that the road leading past the bridge runs west towards Eureka Springs, and was about 150 yards from the bridge.

There was testimony tending to show that a car similar to the one that was used by appellant and McCurdy was parked on the premises of one Wise, adjoining appellant's home in Harrison, and that Wise had entered a plea of guilty to burning a bridge on the railroad in Boone County.

Appellant was a witness in his own behalf, and gave an account of his whereabouts on the night of the burning of the bridge and the days preceding and succeeding. He stated that when he passed through Eureka Springs on the evening of January 8 he was en route from his home in Harrison to Rogers, in Benton County, to visit his wife's mother, who was sick. He testified that he asked McCurdy to drive him over there, and that, after stopping at the garage in Eureka Springs that night, they pursued their journey on to Seligman and thence to Harrison, and returned to Seligman the next day. He testified that, after reaching Seligman, it was his purpose to go to Monett to seek employment in the railroad service there, but that McCurdy persuaded him to return to Harrison, and that he did so at McCurdy's urgent request, reaching Eureka Springs about seven o'clock on the evening of January 9, as stated by the other witnesses. In fact, there is no conflict in the testimony

up to this point concerning the journey of appellant with McCurdy through Eureka Springs and back.

Appellant denied that he had any conversation with witness Weston, as detailed by the latter, and stated that they did not stop at the house of any one on the journey back to Eureka Springs, nor had any such conversation with any one as detailed by Weston. He testified, as before stated, that, after leaving Eureka Springs on the night of January 9, he got out of the car and walked back to the city, on account of the fact that McCurdy had picked up Nelson, a man about whom there was a suspicion of lawlessness, and that he did not wish to be seen riding in the car with Nelson. Appellant testified that, after he returned to Eureka Springs, he saw a man about to leave that city in a car for Seligman, and that he took passage in the car and returned to Seligman that night for the purpose of taking passage on a train over the Frisco to Monett. He testified that the man with whom he rode that night was named Plummer, who worked in a garage at Seligman. Plummer was introduced as a witness, and corroborated appellant. He testified that he had carried a traveling man from Seligman to Eureka Springs that afternoon, and that on the return trip he permitted appellant to ride with him back to Seligman, and accepted seventy-five cents in payment for the ride, merely to cover the cost of the gasoline.

Appellant testified that after reaching Seligman he left there on a freight train and went to Monett; he said he first tried to arrange with the brakeman for a ride, but, failing to do this, he rode between the cars, and that on reaching Monett he sought the yardmaster and applied for a switching job, but that the yardmaster informed him that he could not use him at that time, but would give him a job in about thirty days. He testified that he rode on a freight train out of Monett over to Aurora, and came to Bergman the next day over the Missouri Pacific Railroad, and then drove over in a taxicab from Bergman to Harrison.

The theory of the State is that appellant and Mc-
Curdy, after leaving Eureka Springs on the night of
January 9, left the road from Eureka Springs to Har-
rison and drove out to within a short distance of the
bridge in question, and set fire to the bridge, using coal
oil or other combustible oil which was carried in the can
that was seen in the car by witnesses, and which appel-
lant admits was in the car.

The facts and circumstances, the substance of which
is detailed above, were relied on by the State as sustain-
ing the conviction, and we are of the opinion that this
evidence was legally sufficient to warrant the jury in
finding that appellant and McCurdy burned the bridge.
There was, as indicated above, a sharp conflict in the
testimony on material points. There was a conflict even
as to the cause of the burning of the bridge, whether it
was by fire escaping from the ashpan or smokestack of a
passing engine, or was communicated by forest fires.
There was much testimony introduced tending to show
that fire escapes from the ashpan of engines and that
several bridges have been known to catch fire from that
source. There was also testimony that there was a
forest fire raging in that region that night.

The State was permitted to prove by witness Mur-
ray, over the objection of appellant's counsel, that,
shortly after the beginning of the strike in the year 1921,
there were depredations committed on the railroad prop-
erty, which consisted of cutting air-hose, interfering with
employees, placing obstacles on the line, throwing
switches, raising one end of the joint in rails so as to
cause derailment, cutting telegraph wires, soaping or
greasing the track, putting emery dust in the bearings
of locomotives and cars, and putting vitriol in the water
so as to cause the flues of the boilers to leak. There was
no proof connecting appellant or any of the striking
employees with those depredations, except that two of
the strikers, Wise and Orr, confessed and pleaded guilty
to burning a bridge at Everton, in Boone County. The

most that the witnesses testified in connecting the strikers with these depredations was as to the confession and conviction of Wise and Orr, and that there were seven or eight strikers who were under suspicion. The witnesses testified, under cross-examination, that they did not know who had committeed these depredations, except as a matter of surmise. We are of the opinion that this testimony was incompetent. In order to render it competent, it was necessary to show some concert of action on the part of the strikers to commit unlawful acts, and that appellant was a party to the conspiracy to commit the unlawful acts. This could, of course, be shown by circumstances as well as by direct testimony, but we find no proof in this record tending to connect appellant or the other strikers with the depredations committed along the line of the railroad. The question of the admissibility of this testimony falls within elemental rules of evidence with reference to proof of other acts committed pursuant to a conspiracy. But, in the absence of proof connecting appellant with the alleged acts of other parties, such testimony falls within the maxim, *res inter alios acta alteri nocere non debet,* which is one of universal application. *Hamburg Bank* v. *George,* 92 Ark. 472. It is needless to add that the testimony may have been highly prejudicial, and we are unable to say that it was without influence with the jury in reaching a verdict, hence the error calls for a reversal of the judgment.

The court, in its charge to the jury, limited the consideration of this testimony to the question whether the fire resulted from accident or was of incendiary origin, but the testimony was not competent for that or any other purpose. The accused was not responsible for the acts or conduct of others, in the absence of concerted action or agreement to which he was not a party.

We are also of the opinion that the court erred in two of its rulings on objections made by appellant to statements of the prosecuting attorney in the closing

argument. In one instance the prosecuting attorney made this statement: "I have been a railroad man, and have belonged to the union, and I know that the defendant could not have gotten a job from the night yardmaster at Monett, Missouri." In another instance the prosecuting attorney made the following statement: "Charles Baltzell was here to show the time that the train left Seligman for Monett, and we had the conductor here to show that defendant did not ride on that train." It was highly important to the defense of the accused that he give an account of his whereabouts on the night the alleged crime was committed, and there was a direct conflict in the testimony. The testimony of the State's witnesses tended to show that appellant left Eureka Springs that night with McCurdy, going toward Harrison, which would have enabled them to have changed over to the road going by the burned bridge. On the other hand, the appellant claimed that he left McCurdy and went back to Eureka Springs and thence over to Seligman. He claimed that he rode on a freight train that night from Seligman to Monett, and that he applied to the night yardmaster for work, and was promised employment by the yardmaster. The prosecuting attorney undertook to state, as a fact, from his own knowledge, that appellant could not have obtained employment from the yardmaster, and also stated, in effect, that there were two witnesses present who, if introduced, would have testified that appellant did not ride the freight train that night from Seligman to Monett. According to the record, the court made no ruling on these statements in response to the objections of appellant's counsel, and exceptions were duly saved in each instance. The statements constituted, in effect, the introduction of testimony and of the witnesses named by the prosecuting attorney over the objections of appellant, without the prosecuting attorney or either of those witnesses being introduced or sworn and without any opportunity on the part of the accused to cross-examine them. Such state-

ments are obviously erroneous. *Fort* v. *State*, 74 Ark. 210.

The effect of these statements was prejudicial, or might have been so, for they contradicted appellant's own acount of his whereabouts on the night the bridge was burned.

Error of the court is assigned in giving instruction numbered 5, which stated the law to be that the defendant could be convicted under the indictment if it was found that he "either himself did set fire to the bridge or was present, aiding, abetting, or assisting some other person or persons so to do." It is conceded that, under the statutes of this State, persons who are present aiding and abetting in the commission of a crime "shall be deemed principal offenders, indicted and punished as such" (Crawford & Moses' Digest, § 2311), but it is contended that, in order to convict one under this state of facts, the person so aiding and abetting must be indicted in connection with the person who committed the act. Counsel cite in support of their contention the case of *Hunter* v. *State*, 104 Ark. 245. This contention, we think, ignores the plain letter of the statute, that it is not essential that the person so aiding and abetting should be indicted with the principal offender who commits the act. The statute provides that the person so aiding and abetting shall be indicted and punished as a principal, and contains no requirement that the indictment shall include the principal offender.

Error is assigned also in the court's refusal to give instructions stating that, in order to convict the accused, the jury must believe beyond a reasonable doubt that the crime had been committed by some one in the manner and form charged in the indictment, and also that it must be shown beyond a reasonable doubt that the burning of the bridge was not caused by accident. Without considering those instructions, it is sufficient to say that the same grounds were fully covered by other instructions telling the jury that, before conviction, they must find beyond a

reasonable doubt that the bridge was burned either by the accused himself or by some one else, and that he was present aiding or abetting in the commission of the crime.

There are several other assignments with respect to the giving and refusing of instructions, but, as before stated, we find it unnecessary to discusss them.

For the errors indicated, however, the judgment is reversed, and the cause is remanded for a new trial.

WOOD and SMITH, JJ., concur in the judgment.