## JONES v. STATE.

### Opinion delivered April 5, 1926.

1. VENUE—CONTEMPT PROCEEDING.—A proceeding to punish for contempt one alleged to have violated an order restraining certain unlawful acts in connection with a strike of coal miners is not an action "for an injury to real property," which must be brought in the county where the land is situated, but is a transitory action which may be brought in any court having jurisdiction of the subject-matter.

2. CONSPIRACY—EVIDENCE.—Evidence *held* insufficient to establish a conspiracy between defendant and others to commit unlawful acts in violation of the court's injunction.

3. CONTEMPT—MODIFICATION OF SENTENCE.—Where appellant led a large number of striking miners and their wives, with banners having slogans inscribed thereon, in technical violation of an injunction prohibiting such congregating upon the mine property, but without any acts of violence, an order punishing appellant by a fine of $500 and imprisonment for three months was excessive, and will be modified by reducing the punishment to a fine of $50.

Appeal from Sebastian Chancery Court, Fort Smith District; *J. V. Bourland*, Chancellor; judgment modified.

*S. P. Freeling, C. E. B. Cutler* and *G. L. Grant*, for appellant.

*H. W. Applegate,* Attorney General, *John L. Carter,* Assistant, *Webb Covington* and *Evans & Evans,* for appellee.

McCulloch, C. J. This is a proceeding for punishment for civil contempt in violation of an injunction issued by the chancery court of Sebastian County, Fort Smith District, the record having been brought up here both by appeal and by certiorari.

On June 19, 1925, three coal mining companies owning and operating separate mines in the Greenwood District of Sebastian County—Greenwood Coal Company, Mammoth Vein Colliery Company, and Backbone Coal Company—jointly filed a complaint in the chancery court of Sebastian County, Fort Smith District, seeking to restrain the appellant (petitioner) and others from interfering with the operation of the mines. After alleging the ownership and operation by the plaintiffs of the separate mining properties and setting forth the controversy between the plaintiffs and the defendant concerning the scale of wages to be paid in the operation of the mines, it was charged in the complaint that the defendants were interfering with the operation of the mines and causing great injury to the business of plaintiffs by using violence towards their employees so as to intimidate them into refraining from working in the mines. There are also allegations in the complaint that depredations were being committed upon the mining properties and injuries to the property being done. The prayer of the complaint was that defendants be restrained "from destroying or attempting to destroy any of the property or property rights of these plaintiffs, and from going upon their property and from intimidating or interfering with any of their agents, representatives or employees in any manner, and from coercing or attempting to coerce, in any manner, any person in the employ of these plaintiffs, or any one seeking employment, or with any person or persons having declared an intention to seek employment in the mines of these plaintiffs, and from doing or performing any act, or attempting to do or

perform any act, tending to interfere with the operation of their said mines, or the conduct of their business in any respect whatever.'' The suit was against the organization of miners known as District No. 21, United Mine Workers of America, and certain local organizations thereof in Sebastian County, and also against numerous defendants, including appellant, Comer Jones, who was at that time vice-president of District No. 21, United Mine Workers of America.

The controversy between the mine operators and the union miners arose over the wage scale. It appears that the mines were then in operation under a scale of wages adopted in the year 1917, referred to as the ''1917 scale.'' In the year 1924 a new scale was adopted, allowing higher wages to the miners, and there was operation under that scale for a short time, but, in the early part of the year 1925, the operators discarded the 1924 scale and went back to the 1917 scale. The unions refused to recognize or abide by the 1917 scale, and a strike resulted, the operators insisting on the 1917 scale of wages, and the union miners insisting on the 1924 scale. At the commencement of the action, the chancery court issued a temporary injunction, which was immediately served on the officers of District No. 21 and also upon each of the individuals named as defendants. The order contains six clauses, and appellant is charged with violating two of them, which read as follows:

''2. From intimidating or indulging in any conduct calculated to intimidate the officers, agents or employees of the plaintiffs or any person or persons seeking employment of the plaintiffs, and from following or surrounding the officers, agents or employees of the plaintiff or persons seeking employment of the plaintiffs, for the purpose of annoying or interfering with any such person or persons, while such person or persons are engaged in the performance of their duties for the plaintiff, or otherwise.

''4. From congregating in large or small numbers at, or near, the place of business of the plaintiffs, or the home or abode of any of its officers, agents or employees,

or any person or persons seeking employment of plaintiffs, or on or near any of the property owned and controlled by plaintiffs, as described and set forth in the complaint herein, and from congregating upon any road or highway, traveled by the officers, agents or employees of plaintiffs, for the purpose of intimidating, through force of numbers, any officer, agent or employee of the plaintiffs, or any person or persons seeking employment of the plaintiffs, and thereby preventing them from continuing in the service of plaintiffs or from entering their employ."

Appellant and certain other defendants in the original action were cited for contempt upon the affidavit of R. A. Young, the superintendent of plaintiff companies, filed on August 3, 1925, alleging violation of the injunction by appellant on August 1, 1925.

It is alleged in the affidavit that appellant "wilfully and knowingly violated paragraphs two and four of said restraining order, and that the said Jones headed a procession of about one hundred and fifty women and marched to the mine of the plaintiff, Greenwood Coal Company, located near the town of Greenwood, Arkansas, and with intent to violate said restraining order, entered upon the premises owned and controlled by the said plaintiff, and, for the purpose of showing his contempt for the orders of the court, entered upon said premises and led said procession to the mine and place of business of the said plaintiff, and in doing so the said Jones fully intended to and did intimidate the officers and employees of the said plaintiff, all in violation of the restraining order as aforesaid, and in violation of the rights of plaintiff." It is also alleged in the affidavit that on August 1, 1925, the appellant and one Robertson, acting in concert, violated the injunction by causing one Frank Price to commit certain acts in intimidation of the agents and employees of the plaintiffs.

Appellant appeared before the court on the day to which he was cited to appear and filed an answer containing a plea to the jurisdiction of the court in the original

action, and also containing appropriate denials of the
charge of contempt in violating the injunction. The
court treated appellant's plea to the jurisdiction as a
demurrer and overruled the same, and the trial proceeded
upon the issues as to the alleged act of appellant in vio-
lating the injunction of the court.

After hearing the testimony, the court made
a finding that appellant was guilty of violating the
injunction, and imposed punishment of a fine of $500 and
confinement for three months in the county jail.

There is first presented the contention of appellant
that the chancery court in the Fort Smith District of
Sebastian County was without jurisdiction, for the reason
that the property of the plaintiffs was situated in the
Greenwood District. Counsel rely upon the statute
(Crawford & Moses' Digest, § 1164, 4th sub.) fixing the
venue "for an injury to real property" in the county in
which the subject-matter, or some part thereof, is situ-
ated. In other words, counsel contend that this is an
action to recover on account of "an injury to real prop-
erty"—an action to prevent injury to real property—
and that, the two districts of Sebastian County being the
same as separate counties for the purpose of determining
the jurisdiction of the courts (*Jewett* v. *Norris,
ante* p. 71), the chancery court of the Fort Smith
District was without jurisdiction. Counsel are entirely
mistaken in their estimate of the subject-matter
of the litigation. It is true that the complaint
contains allegations concerning injury to plaintiff's
real property, but this is alleged merely as an
effect upon the operation of the business of coal mining
by the plaintiffs, and the primary purpose of the suit is
to restrain the unlawful interference with plaintiff's busi-
ness of coal mining. The effect of the court's final decree,
when rendered, will act in restraint of the defendants in
their personal conduct towards the business and property
of the plaintiffs; hence it is a personal action and not one
to recover for an injury to real property. In other words,
plaintiffs are not suing to recover for a trespass upon

land, but they are seeking equitable relief against an
alleged unlawful interference with their business. No
citation of authority is necessary to support the obvious
principle that the action is transitory, and that any chan-
cery court which obtains jurisdiction of the person of
the defendants acquires jurisdiction of the subject-
matter.

The theory of the prosecution was, and is, that there
was a conspiracy on the part of the officers of District
No. 21 and the other union miners to make use of violence
and intimidating methods towards the officers and agents
of the coal companies and the non-union miners working
in the mines, so as to compel the coal companies to accede
to the demands of the unions and to restore the 1924 wage
scale. The chancellor permitted the testimony to take a
very wide range, so as to cover the conduct of the striking
miners in two of the States covered by District No. 21—
Arkansas and Oklahoma. The prosecution was per-
mitted to introduce testimony concerning acts and con-
duct of the miners in and about the coal mines in both
States. There was evidence establishing the fact that
the strike was on at all the mines in Arkansas and Okla-
homa, and that there were unlawful acts of intimidation
and depredation committed at many of the mines. There
were public gatherings of union miners which women
and children largely attended, and speeches were made
inciting the miners to firmness and aggressiveness in
insisting upon their claims. Public prayer meetings were
held, it seems, for the purpose of giving expression to the
insistence of the union miners in regard to their asserted
rights. There were street processions with banners
bearing mottoes which indicated the purpose of the strike
and the attitude of the miners towards it. There was
evidence that on some occasions the miners and the
women and children, in sympathy with them, flung insults
at the non-union miners working in the mines. There
were two nonresident speakers brought into the territory
by the unions, one man named Fowler, from Pennsyl-
vania, and another man named Michael, who made

speeches at various meetings and used, it is claimed, inflammatory language calculated to incite union miners to violence. Some of these meetings were at mines in Sebastian County and some in Franklin and some in Johnson County. The witnesses testified that these two men, in their public speeches, advised the miners to "put the women forward" as the effective method of enforcing their demands, and advised that the men support the women in their efforts. All of the witnesses who testified, however, concerning the speeches of these two men, testified that they stated that they had respect for the courts and for the law, and advised the miners not to disobey the injunction. Neither of these two men were arrested on the charge of contempt, and it appears that both of them left the State before warrants could be served. There is no proof that appellant Jones attended any of the meetings or that he participated in any gatherings or processions or in any acts of violence or advised or encouraged any of them, the testimony against him being confined to his participation in a meeting and the procession at Greenwood on Saturday, August 1, 1925.

We are of the opinion that the prosecution has failed to establish a conspiracy between the appellant and other persons to commit unlawful acts in violation of the court's injunction. We have often decided that conspiracy to commit unlawful acts may be proved by circumstantial evidence as well as by direct testimony, and that a conspiracy may be inferred from proof that two or more persons pursued the same unlawful objects, each doing a part, so that their acts, though apparently independent, were in fact connected. *Chapline* v. *State,* 77 Ark. 444; *Parker* v. *State,* 98 Ark. 575; *Sims* v. *State,* 131 Ark. 185; *Pritchett* v. *State,* 160 Ark. 233. Those decisions were in criminal prosecutions where the court was testing the legal sufficiency of the evidence, but in the present case we are trying the facts *de novo* as they appear in the record for the purpose of determining whether or not the decree of the chancery court is supported by the evidence. In other words, we are now ascertaining not only the

legal sufficiency but the weight of the evidence in determining whether or not appellant should be punished for contemptuous conduct in disobedience of the temporary injunction issued by the chancery court. Conceding that a bare inference might in some degree be indulged that appellant joined all the other officers of District No. 21 and the union miners generally in a common undertaking to adopt means whereby the operators could be induced to restore the 1924 scale, yet the testimony is not sufficient to connect appellant with the remotely disconnected conduct of individuals who are shown to have exceeded the limits placed upon their activity by the court's injunction. There is no proof, as we have already seen, that appellant actually participated in any act or declaration of violence, unless it be found in his conduct at Greenwood on August 1, 1925, which will be discussed later, and it would be, we think, an extreme inference to say that he joined in a conspiracy to do those things in the absence of proof that he was present at any of the other meetings or at any time when acts of violence were committed.

On August 1, 1925, there was a meeting of the miners, and especially of the women, at Greenwood, near which place the mine of the Greenwood Coal Company is situated. The meeting was held on the public square in the town of Greenwood, and there was a very large crowd in attendance. Appellant Jones made a speech at the meeting from the platform. The meeting was held about 4:30 in the afternoon. Several witnesses were introduced who testified concerning this meeting, but none of them heard appellant's speech, and there is no testimony in the record at all as to what he said or did on that occasion, further than the fact that he was observed speaking from the platform. There is no testimony that any other speeches were made at the meeting except that of appellant. Nor is there any evidence of any violent conduct or declarations at that meeting.

J. G. Puterbaugh, the president of the plaintiff coal companies, and R. A. Young, the super-

intendent, in anticipation of violent or disturbing conduct on the part of the miners, both went to Greenwood on the day in question, and they invited the sheriff of the county to go for the purpose of preventing violence. Shortly after the meeting disbanded a procession was formed, composed of about two hundred women and a few men, and this procession, carrying banners, was led by appellant to one of the mines near Greenwood. According to the testimony, appellant carried a United States flag, and others carried a large banner, or streamer, with the name "United Mine Workers of America" on it, some of the banners bearing the slogan, "Down with the 1917 scale," and various other legends, and one of the banners was inscribed, "No scabs for us." The sheriff testified that, as this procession was being formed, he spoke to several of the men and requested them not to go to the mines; that some of them asked him about the parade, and he told them that, so far as he knew, that would not constitute a violation of the injunction, but he advised the men not to go on the mine property. He testified that he did not have any conversation with appellant Jones that day. The parade passed along the public road in the direction of the mine, and when it reached to a distance of about a quarter or an eighth of a mile from the mine the procession halted for a few moments and then turned into the mine property, along a private road used as an approach to the mine. There is no proof of any demonstration of the participants in the parade except the carrying of the banners as before stated. Both Puterbaugh and Young were at this mine at the time, and, as the procession approached, Young went inside of the wash-room to use the telephone in communicating with the sheriff. Puterbaugh remained on the outside and waited for the procession to come up. All the testimony as to what occurred there comes from Mr. Puterbaugh, who was introduced as a witness by the prosecution. He testified that the procession came up to within about one hundred feet of the tipple of the mine, and that appellant, when he came in speaking distance,

bowed to Puterbaugh, and made the following inquiry, "Where is Robert?" meaning Mr. Young. Puterbaugh replied that Young was in the engine house, and added (speaking to appellant), "You have no right on this property. You are violating the law and the court's injunction by coming on this property with a crowd of people." Appellant then asked Puterbaugh whether objection was made, and Puterbaugh replied to appellant that he was trespassing on the company's property. Appellant immediately, and without any one speaking further, turned the procession across the railroad track and back to town. Puterbaugh testified that there was nothing else said or done.

The proof thus establishes the fact that appellant led the procession onto the property of the coal company. It will be observed from perusal of the paragraphs of the injunction hereinbefore copied that there is no restraint from merely congregating at or near the place of business of the plaintiffs, or on or near the property owned and controlled by the plaintiffs, but the inhibition is against the doing of those things "for the purpose of intimidating through force of numbers any officer, agent or employee of the plaintiffs, or any person or persons seeking employment of the plaintiffs, and thereby preventing them from continuing in the service of plaintiffs or from entering their employ." The striking miners had the legal right to make use of peaceful means to give publicity to their claims and to induce support in their own behalf. *Local Union No. 313* v. *Stathakis,* 135 Ark. 86. In the interpretation of the temporary injunction issued by the chancery court we must assume that that court did not intend to deny the union miners the exercise of their legal rights as declared by this court. Hence we construe the meaning of the court's order to be that the miners were restrained from going upon the property of the operators in a menacing attitude, so as to intimidate the employees there at work. The entry upon the mine property by the procession, composed of union miners and their women sympathizers carrying banners with the

slogans and legends inscribed thereon, was, in fact, in the nature of a menace, and constituted a violation of the injunction—only a technical violation, we think,—but the conduct of the appellant and the other participants, in the entire absence of menacing words or other acts than the mere entry upon the land, negatives any actual intention to commit an act of violence in disobedience of the injunction.   The participants are theoretically presumed to have intended what their conduct indicated, an intention to induce, by the use of epithets, an acquiescence in their claims, hence there has been, as before stated, a technical violation of the injunction.   But we think that the proof shows that there was no actual intention to intimidate, and that therefore the technical violation of the injunction does not call for severe punishment. The evidence, as we have already seen, shows that nothing in the way of actual intimidation was attempted. Nothing else was done by any member of the crowd except to carry the banners. Appellant, in approaching Mr. Puterbaugh, did so in a most respectful manner, according to Puterbaugh's testimony. He bowed, and asked for Mr. Young, with whom, it seems, he was well acquainted.   The testimony of Mr. Puterbaugh does not indicate that the inquiry for Young was made in any threatening manner, and, as soon as appellant was informed where Young was at the time and objection was made to his presence at the mine, appellant immediately led his crowd away.   There is proof that, later during the day and after the procession had disbanded, other persons at Greenwood used insulting language towards officers and agents of the company, but there is no proof to connect appellant therewith.   On the contrary, it appears that appellant had left the scene when those things happened.

The chancellor was correct in finding that his injunction had been violated, and, of course, even a technical violation called for some degree of punishment.   We are of the opinion, however, that the punishment was too severe, there being no actual intention to show disrespect of the court or its process.   Our conclusion is that the

imposition of a fine of fifty dollars would be sufficient punishment for the technical violation of the injunction, and the decree is modified to that extent. It is so ordered.

HART, J., (dissenting). Gomer Jones was a party to the injunction proceedings, and was vice president of District No. 21, United Mine Workers of America. The record shows that he knew what he was about, and that he was guilty of wilful disobedience to the order of injunction, if in fact he disobeyed it, and the punishment would not be excessive. In passing, it may also be said that, in contempt proceedings for violating an injunction, I believe it is better to follow the rule laid down by the Supreme Court of the United States, to the effect that the guilt of the defendant must be established beyond a reasonable doubt, because it is a criminal contempt. *Gompers* v. *Buck Stoves, etc, Co.,* 221 U. S. 418, 34 L. R. A. (N. S.) 874; *Gompers* v. *United States,* 233 U. S. 604, Ann. Cas. 1915D, p. 1044; and *Staley* v. *South Jersey Realty Co.,* 83 N. J. Eq. 300, 90 Atl. 1042, Ann. Cas. 1916B, p. 955.

My dissent, however, is based upon the ground that there is nothing in the record to show that Jones was guilty of contempt by violating the order of injunction. It is true that the order is very broad and comprehensive; but I do not think it was intended, or that the words used indicate, that the defendants were enjoined from going upon the premises of the plaintiffs except for the purpose of intimidation or injury to their employees or property. Upon this point, the order of injunction comprises six sections. Section one enjoins the defendants from assaulting, attempting to assault, threatening or using offensive language toward any employee of the plaintiffs or any one seeking employment from them.

Section two enjoins the defendants from intimidating or indulging in any conduct calculated to intimidate the employees of the plaintiff, or from following or surrounding them or any person seeking employment from the plaintiffs, for the purpose of interfering with

any such person or persons in the discharge of their duties as such employees.

Section three enjoins the defendants from following any employee of the plaintiffs, or any person seeking employment from them, to their homes, against their will, for the purpose of annoying or intimidating them with respect to their employment by the plaintiffs.

Section five enjoins the defendants from enticing the employees of the plaintiffs, or any person seeking employment from them, by force, threats and intimidation, to leave or refuse to enter the service of the plaintiffs, upon the ground that plaintiffs are not conducting their business as desired by the defendants.

Section six enjoins the defendants from destroying or attempting to destroy property of any kind of the plaintiffs, and from attempting to destroy or interfere with, in any manner, any such property.

I do not think that the record shows that the provisions of any of these sections were violated by Jones.

Section four reads as follows: ''From congregating in large or small numbers at or near the place of business of the plaintiffs, or the home or abode of any of its officers, agents or employees, or any person or persons seeking employment of plaintiffs, or on or near any of the property owned and controlled by plaintiffs, as described and set forth in the complaint herein, and from congregating upon any road or highway traveled by the officers, agents, or employees of plaintiffs, for the purpose of intimidating, through force of numbers, any officer, agent or employee of the plaintiffs, or any person or persons seeking employment of the plaintiffs, and thereby preventing them from continuing in the service of the plaintiffs or from entering their employ.''

A careful consideration of this section leads me to the conclusion that Jones did not violate any of its provisions. In reaching this conclusion I believe that the words, ''for the purpose of intimidating, through force of numbers, any officer, agent or employee of the plaintiffs, or any person or persons seeking employment of

the plaintiffs," modify and refer to each of the preceding clauses in the section, and not merely to the clause next preceding the words quoted.

The learned chancellor certainly did not intend to enjoin them from congregating in large or small numbers near the place of business of the plaintiffs or near the homes of its employees or the homes of persons seeking employment from the plaintiffs, regardless of their intention in so doing. This would place the order of injunction in direct conflict with the principles decided in *Local Union No. 313* v. *Stathakis,* 135 Ark. 86; and it cannot·be assumed that the learned chancellor had any such intention. Every situation which could result in harm to the employees of the plaintiffs or persons seeking employment from them, or in injury to their property, was met in the injunction, and I cannot think that the learned chancellor meant to·enjoin the defendants from congregating in large or small numbers at or near the business of the plaintiffs or their homes, for a peaceful or lawful purpose. It will be noted that the injunction is directed with equal force against large or small numbers and at places near the business place of the plaintiffs and the abodes not only of its employees but of those seeking employment. In short, I think the injunction was only against such assemblages when they were for the purpose of intimidation or interference with the business of the plaintiffs; and I find no proof in the record of any such purpose on the part of Jones.

Mr. Justice H u m p h r e y s authorizes me to state that he concurs in the views here expressed.